Filed 12/3/14 Unmodified version attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROBERTO MARTINEZ et al., | B242807 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC377269) |
| v. | |
| JOE'S CRAB SHACK HOLDINGS et al., | ORDER MODIFYING OPINION AND DENYING REHEARING (NO CHANGE IN JUDGMENT) |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion filed herein on November 10, 2014 be modified as follows:

On page 6, footnote 8, delete the words "that inadequately explained the claims" so that the footnote reads:

According to CAI, more than 90 putative class members have settled potential claims with CAI and Landry's directly although the record includes only 10 of these settlement agreements. CAI obtained these releases by reading a prepared script to managerial employees and offering a $500 payment for each year employed as a manager (or approximately $10 per week). Three other employees, including Kevin Austin, a former general manager who provided a declaration on behalf of CAI in this litigation in 2008, settled their claims through the Division of Labor Standards Enforcement. The settlement amounts that have not been redacted (eight of 13 agreements) range from $250 to $5,000.

Respondent's petition for rehearing is denied. There is no change in judgment.

_____

PERLUSS, P. J.          WOODS, J.          SEGAL, J.[*]

_____

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROBERTO MARTINEZ et al., | B242807 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC377269) |
| v. | |
| JOE'S CRAB SHACK HOLDINGS et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charles F. Palmer, Judge.  Reversed and remanded.

Righetti Glugoski, Matthew Righetti and John Glugoski, for Plaintiffs and Appellants, Roberto Martinez, Lisa Saldana, Chanel Rankin-Stephens and Craig Eriksen.

Epstein Becker & Green, Michael S. Kun and Ted A. Gehring, for Defendants and Respondents Crab Addison, Inc. and Ignite Restaurant Group, Inc.

Law Offices of Mary E. Lynch; Mary E. Lynch; Sheppard, Mullin, Richter & Hampton, Charles F. Barker and Karin Dougan Vogel, for Defendant and Respondent Landry's Restaurants, Inc.

_____

Litigation by class action has long been recognized as a superior method of resolving wage and hour claims in California (see *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1033 (*Brinker*)), including those seeking redress for unpaid overtime wages. Nonetheless, when confronted with the myriad individual facts asserted by employers in support of the executive exemption as a defense to a wage claim, courts at all levels have struggled to answer the question central to certification of a class—that is, "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 (*Sav-On*); accord, *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28 (*Duran*); *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531 (*Ayala*).)

Here, the trial court, after wrestling with the factual issues raised by Defendants Crab Addison, Inc., Ignite Restaurant Group, Inc. and Landry's Restaurants, Inc.,[1] denied class certification to a putative class consisting of managerial employees allegedly misclassified as exempt on the grounds plaintiffs had failed to establish (a) their claims are typical of the class, (b) they can adequately represent the class, and (c) common questions predominate the class claims such that a class action is the superior means of resolving the litigation. (See *Brinker, supra,* 53 Cal.4th at p. 1021; Code Civ. Proc. § 382.) Last year we reversed the trial court's order and remanded the matter for reconsideration in light of our then-recent decision in *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701 (*Benton*). (See *Martinez v. Joe's Crab Shack Holdings* (2013) 221 Cal.App.4th 1148, review granted Feb. 19, 2014, S214864.) We filed our prior decision in this case while *Duran* was pending in the Supreme Court, something we had noted in our opinion. The Court granted a petition for review and ordered briefing deferred pending its decision in *Duran*. The Court then decided *Duran* and, on July 30,

---

[1]    Until November 2006 Joe's Crab Shack, a nationwide restaurant chain, was owned by Landry's Restaurants, Inc. (Landry's). The chain is now owned by Crab Addison, Inc., a subsidiary of Ignite Restaurant Group, Inc. (collectively CAI). CAI was sued erroneously under its former name, Joe's Crab Shack Holdings.

2014, transferred the matter to us for reconsideration in light of that decision. The parties have submitted supplemental briefs, which we have considered. We remain convinced the trial court erred in denying certification and remand the case to that court for reconsideration of its order.

## FACTUAL AND PROCEDURAL BACKGROUND

Roberto Martinez, Lisa Saldana, Craig Eriksen and Chanel Rankin-Stephens are current or former employees of different Joe's Crab Shack (JCS) restaurants in California. Martinez filed the original complaint in September 2007, seeking to represent a class of salaried managerial employees who worked at JCS restaurants in California on claims they had been misclassified as exempt employees and were entitled to overtime pay.[2] In March 2010 the trial court denied Martinez's motion for class certification on the ground he was not an adequate class representative. Martinez did not appeal that order.

The trial court permitted Saldana, Eriksen and Rankin-Stephens to join the lawsuit as named plaintiffs. In June 2011 plaintiffs moved for certification of a class consisting of "[a]ll persons employed by Defendants in California as a salaried restaurant employee in a Joe's Crab Shack restaurant at any time since September 7, 2003." In support of their motion plaintiffs presented training and operations manuals, as well as deposition testimony from various witnesses employed by CAI and Landry's. According to this evidence, JCS's hiring and training practices are uniform throughout the chain; it utilizes an operations manual that applies to all restaurants and every employee; each restaurant offers the same menu; and managerial employees are evaluated using the same form and procedure. All managerial employees are classified as exempt employees and are expected to work a minimum of 50 hours per week. Each restaurant is staffed with three

---

[2]     The complaint also alleged meal period, rest period and wage statement claims, none of which is at issue in this appeal.

3

to seven managerial employees, who are cross-trained in positions throughout the restaurant and perform the same general tasks.[3]

Plaintiffs also filed 22 declarations from current and former salaried employees who held managerial positions during the relevant time period.[4] The gist of these declarations is the same. Most of the declarants were employed in assistant managerial positions. Although they were told they would be working 50 to 55 hours per week, all stated they had routinely worked more than 55 hours per week; and some reported working more than 70 hours per week. JCS did not keep track of the hours worked by managerial employees. Because labor budgets were set by district or regional managers and, in general, did not provide adequate staffing, managerial employees were required to perform "utility" functions, filling in where needed as cooks, servers, bussers, hosts, stockers, bartenders or kitchen staff. Managerial employees were also required to fill in when hourly employees failed to show up and conduct inventory one night a week after the restaurant closed, which could take as long as three to four hours to complete. As a result, the declarants stated they had worked extended time in positions ordinarily occupied by hourly employees but had received no overtime compensation for those

---

[3]     During the period the chain was owned by Landry's, each restaurant was staffed with a general manager, an assistant manager, a kitchen manager and a front-end manager. Soon after this lawsuit was filed, CAI eliminated the specific positions of kitchen manager and front-end manager and categorized them as assistant managers. CAI's designated person most knowledgeable about JCS managerial practices (see Code Civ. Proc., § 2025.230), Michael Young, testified that "all restaurants do universal tasks. . . . [Employees] wash dishes, they serve food, they help guests. It's all basically the same. However, each restaurant is different . . . ; depending on what's going on in the course of a day. How many people you have. Skill level of people." Asked to distinguish between tasks performed by hourly employees from the same tasks performed by managerial employees, Young stated, "Managers . . . help out in various positions. They may perform the same tasks, but it doesn't make it an hourly function at that time. If they're performing their job based on where they need to be at a specific time[;] they're using their judgment to assess where they need to be and what they're doing at that specific time."

[4]     As of the date the motion was filed, the parties agreed there were 182 members of the putative class.

4

tasks. Each of the declarants estimated he or she had spent the majority of his or her time performing hourly tasks; estimates ranged from more than 50 percent to 95 percent. Several employees, some of whom had worked in more than one restaurant or under both Landry's and CAI ownership, stated that these practices were common across the board.[5]

CAI and Landry submitted declarations from approximately 27 putative class members, each of whom reported significant variance among the duties associated with specific management positions, the amount of time they routinely spent on particular tasks and the total amount of time worked each week. More than half of the declarations were provided by general managers, most of whom had served in subordinate managerial positions in the past.[6] Many of the declarants had been hired when Landry's owned the

---

[5]     For instance, a former JCS employee (Brian Brinson), who first worked as an hourly kitchen worker in a Virginia JCS location, moved to California and worked in three different JCS locations as an hourly kitchen supervisor and as a salaried kitchen manager and senior kitchen manager. As a salaried manager Brinson averaged 60 to 70 hours per week, including weekly inventory that continued into the early hours of the morning. He estimated he spent 80 to 90 percent of his time performing the same tasks as the hourly employees—seating, bartending, running food, bussing tables, serving food, cleaning and cooking. His managerial duties took little time to complete. Based on his experience in both capacities he stated: "I can honestly say that when I moved into a managerial position my tasks remained the same and I did the same things I did when I was an hourly employee . . . . I felt like I was every position rolled into one. At Joe's, things are done this way and I often needed to fill in wherever I was needed. In addition, often we would have to cut back on labor and send some of our hourly employees home[;] this meant even more time on hourly tasks. Further, if I needed to cover employee shifts I would often work a double shift." Brinson stated his job required him to act in a "utility" capacity and that, because managers did not count against the labor budget, managers were required to perform the tasks of hourly employees, who would have had to be paid overtime.

[6]     Damian Garcia, a general manager, had also worked as an assistant general manager and a kitchen manager. He stated the total amount of time he spent on exempt activities varied depending on his position. As a general manager he spent five hours per week training employees but as a kitchen manager spent 10 to 15 hours each week training employees. He spent less time directing work as a kitchen manager and spent more time in that role as an assistant general manager. As a general manager he spent five hours per week analyzing and forecasting sales but had no such duty as a kitchen manager.

chain and had signed acknowledgements of the duties associated with their job and their exempt status.[7] These declarants uniformly described their duties as primarily managerial in nature and, with only a couple of exceptions, opted out of the putative class proposed by plaintiffs.[8] Many declarants estimated the amount of time they spent weekly performing discrete "primary" (that is, managerial) duties and "additional" (that is, nonexempt) duties and stated that, even when they were performing tasks ordinarily associated with hourly workers, they were monitoring the restaurant and supervising and directing employees.[9] James Kuhn, a senior vice president with CAI who oversees the 13 California JCS restaurants, stated the activities of managerial employees differed based on the sales volume, seating capacity, amenities and staffing of the particular restaurant, no two of which are the same. While CAI centralized management makes

---

[7] In 2005 Landry's directed its general managers to meet with salaried employees to review their duties and execute acknowledgements the majority of the employees' time was spent on exempt tasks. There is no evidence in the record CAI ever trained or instructed managerial employees regarding the distinction between exempt and nonexempt duties.

[8] According to CAI, more than 90 putative class members have settled potential claims with CAI and Landry's directly although the record includes only 10 of these settlement agreements. CAI obtained these releases by reading a prepared script to managerial employees that inadequately explained the claims and offering a $500 payment for each year employed as a manager (or approximately $10 per week). Three other employees, including Kevin Austin, a former general manager who provided a declaration on behalf of CAI in this litigation in 2008, settled their claims through the Division of Labor Standards Enforcement. The settlement amounts that have not been redacted (eight of 13 agreements) range from $250 to $5,000.

[9] Primary duties included interviewing, hiring and training employees, scheduling, planning and making job assignments, directing employees, evaluating performance, determining what needed to be purchased for the restaurant, disciplining employees, analyzing and forecasting sales, inventory preparation and analysis, communicating about corporate matters and transitioning assistant managers and staff. Additional duties included interaction with guests, cooking, food service, bartending, bussing tables, expediting orders, taking inventory, checking and replenishing stock, routine clerical duties, hands-on maintenance and cleaning. Most declarants estimated approximately one-third of their time (varying between 55 and 70 hours per week) was spent on additional duties.

6

policy decisions affecting JCS restaurants across the board, "the day-to-day decision-making and daily running of the restaurants is left to each restaurant's management team."

CAI and Landry's also submitted evidence impeaching the statements of the named plaintiffs. In deposition testimony the named plaintiffs each conceded he or she was unable to estimate the amount of time spent on exempt tasks as opposed to nonexempt tasks and that every day was different. Eriksen testified it would be "unrealistic" to guess how much time he spent on particular tasks and admitted there were weeks when he devoted more than 50 percent of his time to managerial tasks.[10] Former colleagues of Saldana and Martinez also contradicted statements each had made in declarations concerning hours worked and the time spent on hourly tasks.[11]

Presented with this evidence, the trial court denied the motion for class certification on the grounds plaintiffs had failed to establish (1) their claims were typical of the class, (2) they could adequately represent the class, (3) common questions predominated the claims, and (4) a class action is the superior means of resolving the litigation. The first two findings were based on plaintiffs' inability to estimate the number of hours spent on individual exempt and nonexempt tasks and their admission the amount of time spent on particular tasks varied from day to day. As to the third and fourth findings, the court acknowledged the existence of common questions of law and fact,[12] but concluded there remained significant individual disputed issues of fact relating

---

[10]     Eriksen is also one of the employees who executed a form provided to him by Landry's in 2005 attesting he spent 74.5 percent of his time in managerial functions. The trial court sustained an objection to contradictory statements contained in his declaration based on this inconsistency. Rankin-Stephens executed a similar form in 2006 acknowledging she spent 67.3 percent of her time on managerial functions.

[11]     Martinez's performance evaluations criticized him for failing to supervise or discipline staff or otherwise act in a managerial function. Saldana's evaluations praised her attitude but encouraged her to think more broadly about her job. There is evidence that Saldana was ultimately terminated for altering time reports.

[12]     The court found that all putative class members perform similar duties and responsibilities pursuant to a finite task list.

to the amount of time spent by individual class members on particular tasks. The variability among individual members of the putative class would require adjudication of the affirmative defense of exemption for each class member, "a time- and resource-consuming process." The court rejected as unfair plaintiffs' proffered trial plan, under which their expert, Richard Drogin, proposed to assess the rate at which managerial employees are engaged in nonexempt tasks through statistical sampling methods. Under these circumstances, the court concluded, a class action would not be the superior means of resolving the litigation.

## DISCUSSION

1. *The Standard of Review for a Ruling on Class Certification*

Class actions are statutorily authorized "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." (Code Civ. Proc., § 382.) The party seeking class certification must establish (1) "the existence of an ascertainable and sufficiently numerous class"; (2) "a well-defined community of interest"; and (3) "substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker, supra,* 53 Cal.4th at p. 1021.) The community of interest requirement in turn requires three additional inquiries: (1) whether common questions of law or fact predominate; (2) whether the class representatives have claims or defenses typical of the class; and (3) whether the class representatives can adequately represent the class. (*Ibid.*; accord, *Ayala, supra,* 59 Cal.4th at pp. 529-530.)

"The certification question is 'essentially a procedural one'" (*Sav-On, supra,* 34 Cal.4th at p. 326) that examines "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment" (*id.* at p. 327). A certification motion "'does not ask whether an action is legally or factually meritorious' [citation]," but rather whether the common issues it presents "'are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'" (*Id.* at p. 326; see *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 507 ["the central issue in a class

8

certification motion is whether the questions that will arise in the action are common or individual, not plaintiffs' likelihood of success on the merits of their claims"].)  The court must assume the class claims have merit and resolve disputes regarding the claims' merits only when necessary to determine whether an element for class certification is satisfied.  (*Brinker, supra,* 53 Cal.4th at pp. 1023-1025.)

"We review the trial court's ruling for abuse of discretion and generally will not disturb it '"unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions."'  [Citation.]  We review the trial court's actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling."  (*Ayala, supra,* 59 Cal.4th at p. 530; accord, *Benton, supra,* 220 Cal.App.4th at p. 716; *Dynamex Operations West, Inc. v. Superior Court* (2014) 230 Cal.App.4th 718, 725.)

2.  *The Executive Employee Exemption to Overtime Compensation*

"Under California law, employees are entitled to overtime pay for any work in excess of eight hours in one workday, or 40 hours in any one workweek, unless the employer affirmatively establishes that the employee qualifies for a statutory exemption."  (*Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th 795, 816 (*Heyen*); see *Sav-On, supra,* 34 Cal.4th at p. 324; Lab. Code, §§ 510, subd. (a), 515, subd. (a).)  Labor Code section 515, subdivision (a), authorizes the Industrial Welfare Commission (IWC) to establish exemptions from the overtime pay requirement for "'executive, administrative, and professional employees . . . primarily engaged in duties that meet the test of the exemption . . . [who] customarily and regularly exercise[] discretion and independent judgment in performing those duties . . . .'"  (See *Sav-On,* at p. 324.)

Each of the 16 wage orders promulgated by the IWC to govern various industries or occupations contains an exemption for executive, administrative and professional employees.[13]  Wage Order No. 5-2001 (Wage Order No. 5), which governs the "Public

---

[13]     IWC orders regulate wages, work hours, and working conditions with respect to various industries and occupations.  (See *Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785, 795.)  The Legislature defunded the IWC in 2004; however, its wage

Housekeeping Industry," a category that includes restaurants, is codified at California Code of Regulations, title 8, section 11050. Wage Order No. 5 requires employers to provide overtime pay to employees working more than eight hours in one day or 40 hours in one week (*id.,* subd. 3(A)) but exempts from this requirement "persons employed in . . . [¶] . . . executive . . . capacities" (*id.*, subd. 1(B)). "A person employed in an executive capacity means any employee: [¶] . . . [¶] (a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and [¶] (b) Who customarily and regularly directs the work of two or more other employees therein; and [¶] (c) Who has the authority to hire or fire other employees . . . ; and [¶] (d) Who customarily and regularly exercises discretion and independent judgment; and [¶] (e) Who is primarily engaged in duties which meet the test of the exemption." (*Id.,* subd. 1(B)(1)(a)-(e).) The term "primarily" is defined in the wage order as "more than one-half of the employee's work time." (*Id.*, subd. 2(O).)

To determine whether an employee is primarily engaged in exempt duties, Wage Order No. 5 provides "[t]he activities constituting exempt work and nonexempt work shall be construed in the same manner as such terms are construed" in certain regulations in effect as of January 1, 2001 under the Fair Labor Standards Act (FLSA), specifically title 29 of the Code of Federal Regulations, sections 541.102, 541.104-111, and 541.115-

---

orders remain in effect. (*Peabody v. Time Warner Cable, Inc.* (2014) 59 Cal.4th 662, 667, fn. 3.) There are currently 18 wage orders. Sixteen relate to specific industries or occupations: manufacturing; personal service; canning, freezing and preserving; professional, technical, clerical, mechanical and the like; public housekeeping; laundry, linen supply and dry cleaning; mercantile; product handling after harvest (covering commercial packing sheds); transportation; amusement and recreation; broadcasting; motion picture; preparation of agricultural products for market (on the farm); agricultural; household; and construction, drilling, logging and mining. There is also one general minimum wage order, and one order implementing the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999. (See Cal. Code Regs., tit. 8, §§ 11000-11170; *Brinker, supra,* 53 Cal.4th at p. 1026; *Martinez v. Combs* (2010) 49 Cal.4th 35, 57.)

116. (Cal. Code Regs., tit. 8, § 11050, subd. 1(A)(1)(e).)[14] "Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement." (*Id*., subd. 1(B)(1)(e); see *Ramirez v. Yosemite Water Co*. (1999) 20 Cal.4th 785, 802 (*Ramirez*) [in determining whether employee is an outside salesperson, trial court should consider both how the employee actually spends his or her time and whether the employee's practice diverges from the employer's realistic expectations].)

Like other IWC wage orders, Wage Order No. 5 is a "'quasi-legislative regulation subject to normal principles of statutory interpretation.'" (*Heyen, supra,* 216 Cal.App.4th at p. 817.) Statutory provisions regulating wages enacted to protect employees are liberally construed with "'an eye to promoting such protection.'" (*Ramirez, supra,* 20 Cal.4th at p. 794.) Exemptions are narrowly construed and, as affirmative defenses, must be proved by the employer. (*Id*. at pp. 794-795, accord, *Heyen,* at p. 817.) Moreover, "because the elements of the exemption are stated in the conjunctive, all criteria must be established for the exemption to apply." (*Heyen,* at p. 817; *Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 828-829 [elements of exemption impose independent requirements].)

---

[14]    The applicable federal regulations define exempt work performed by a bona fide executive employee as including "[i]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property." (29 C.F.R. § 541.102(b) (2000).)

11

3. *The Class Is Adequately Represented by Plaintiffs, These Claims Are Typical of the Class*

Although the questions whether a plaintiff has claims typical of the class and will be able to adequately represent the class members are related, they are not synonymous. The typicality requirement's purpose "'is to assure that the interest of the named representative aligns with the interests of the class. [Citation.] "'Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.'" [Citations.] The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."'" (*Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.) A class representative who does not have a claim against the defendants cannot satisfy the typicality requirement. (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 98.)

"The adequacy of representation component of the community of interest requirement for class certification comes into play when the party opposing certification brings forth evidence indicating widespread antagonism to the class suit." (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 696; see *J.P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 212 ["'[t]he adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent'"]; see also *Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1509.) "To resolve the adequacy question the court 'will evaluate "the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available; the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented."'" (*Capitol People First*, at p. 697, quoting *J.P. Morgan & Co.,* at p. 213.) A party's claim of representative status will only be defeated by a conflict that "'goes to the very subject matter of the litigation . . . .'" (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470.)

12

Citing the identical rationale for finding plaintiffs' claims were not typical of the class and, consequently, they would not be adequate class representatives, the trial court stated plaintiffs' claims would be "vulnerable to the defense that each of them performed exempt tasks more than 50% of their work time. This contrasts with the putative class members who [allegedly] spent more than 50% of their work time performing non-exempt tasks."

With respect to typicality, this analysis suffers from an overly focused examination of the facts that concentrated on individual differences rather than commonality. In essence, the trial court resolved the factual conflict between plaintiffs' declarations, in which they stated nonexempt tasks routinely occupied more than 50 percent of their time, and their deposition testimony that they could not estimate the number of hours they spent on individual tasks because those tasks varied day to day. The inability of the witnesses to specify time spent on particular tasks is hardly surprising, however, and does not create an issue that must be resolved on a motion for class certification. What was common to plaintiffs, in addition to the standard policies implemented by CAI at each of their restaurants, was their assertions their tasks did not change once they became managers; they performed a utility function and routinely filled in for hourly workers in performing nonexempt tasks; and they worked far in excess of 40 hours per week without being paid overtime wages. Their claims—and the defense of executive exemption to those claims—are thus typical of the class. (*See Sav-On, supra,* 34 Cal.4th at pp. 336-337.)

The larger problem with the adequacy of plaintiffs to represent the class as defined arises from the antagonism voiced by general managers, who overwhelmingly opposed the litigation. Again, this conflict is not unexpected: A general manager is hardly likely to share the duties of assistant managers, many of whom worked exclusively as kitchen- or front-managers. CAI stresses the fact that JCS restaurants vary in size and volume and were staffed according to need by three to seven managers. It is not hard to conceive that the lower the rung occupied by a particular manager the more likely he or she is to engage in tasks common to the hourly employee. This apparent conflict, however, is not

13

fatal. In the interest of preserving the claims of subordinate managerial employees, the trial court may on remand exercise its discretion to create a general managers subclass or to exclude general managers entirely from the class definition. (See, e.g., *Richmond v. Dart Industries, Inc.*, *supra,* 29 Cal.3d at pp. 470-471 [class action need not be dismissed when trial court can use subclasses to remove any antagonism among members of the putative class]; *Medrazo v. Honda of North Hollywood, supra,* 166 Cal.App.4th at p. 99 [when class representative's """"interests are antagonistic to or in conflict with the objectives of those [s]he purports to represent'" [citation], . . . court should determine if it would be feasible to divide the class into subclasses to eliminate the conflict and allow the class action to be maintained"]; *Capitol People First v. State Dept. of Developmental Services, supra,* 155 Cal.App.4th at p. 697 ["where factual circumstances differ, or class members disagree as to the proper theory of liability, the trial judge, through resort to subclasses, intervention, and the like, may incorporate class differences into the litigation process and afford all members their due in deciding the proper outcome"]; *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 133 ["[t]he use of subclasses is an appropriate device to facilitate class treatment"].)[15]

4. *The Trial Court Failed To Adequately Assess Means by Which Plaintiffs' Theory of Recovery Could Be Proved Through Resolution of Common Questions of Fact and Law*

a. *Predominance analysis under <u>Brinker</u>, <u>Duran</u> and <u>Ayala</u>*

In *Brinker, supra,* 53 Cal.4th 1004 the Supreme Court granted review "to resolve uncertainties in the handling of wage and hour class certification motions," specifically in the context of alleged meal and rest break violations. (*Id.* at p. 1021.) The Court rejected

---

[15]     The trial court did not identify any additional basis for its findings on typicality and adequacy, but the record contains evidence Martinez received overtime wages during a portion of the period he alleges he was a salaried manager and Saldana was terminated for altering time records. On remand the court may consider whether this evidence compromises the ability of either plaintiff to represent the class. (See *Seastrom v. Neways, Inc., supra,* 149 Cal.App.4th at p. 1502 ["named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representation is preoccupied with defenses unique to it'"].)

the Court of Appeal's reasoning that individual issues related to whether class members had missed or waived their breaks made class resolution infeasible. The Court instead found the plaintiffs' "theory of liability"—alleging defendant had a uniform policy that violated the law—"is by its nature a common question eminently suited for class treatment." (*Id.* at p. 1033.) The Court enunciated this standard for determining whether common issues predominate: "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Brinker,* at pp. 1021-1022, fn. omitted.)

*Duran* expanded on these principles in the context of a wage and hour class action challenging whether a bank had properly classified its outside salespersons as exempt employees. (*Duran, supra,* 59 Cal.4th at p. 12.) Relying on its own "profoundly flawed" version of a statistical sampling plan proposed by the plaintiffs (*id.* at p. 13), the trial court had ruled in favor of the plaintiffs after a bench trial and awarded $15 million to the class. The Court of Appeal reversed. The Supreme Court granted review and affirmed the decision of the Court of Appeal, concluding the trial court had improperly denied the bank the opportunity to litigate its affirmative defense of exemption. The Court ordered a new trial on liability and damages and directed the trial court to reconsider whether the individual questions inherent in a misclassification claim might undermine the ability of the court to manage the case as a class action. As the Court explained, "Defenses that raise individual questions about the calculation of *damages* generally do not defeat

15

certification. [Citation.] However, a defense in which *liability itself* is predicated on factual questions specific to individual claimants poses a much greater challenge to manageability. . . . [Citation.] 'Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability.'" (*Id.* at p. 30.) Even if the existence of common issues appears to warrant class treatment, the Court observed, "the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently. [Citation.] '[W]hether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues. [Citations.]' In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." (*Id.* at p. 29.)

*Duran* acknowledged the reluctance of some California courts to certify classes alleging misclassification claims because of the potential for individual questions but concluded, "individual issues will not *necessarily* overwhelm common issues when a case involves exemptions premised on how employees spend the workday. In *Sav-On, supra,* 34 Cal.4th 319, for example, we upheld certification of an overtime class action based on a showing that all plaintiffs performed jobs that were highly standardized. As a result, class members performed essentially the same tasks, most of which were nonexempt as a matter of law. [Citation.] Further, the defendant's corporate policy required all class members to work overtime. [Citation.] Where standardized job duties or other policies result in employees uniformly spending most of their time on nonexempt work, class treatment may be appropriate even if the case involves an exemption that typically entails fact-specific inquiries." (*Duran, supra,* 59 Cal.4th at p. 31.)

*Duran* also addressed whether surveys and statistical sampling are appropriate tools to establish liability in a class context. The Court stated, "if sufficient common questions exist to support class certification, it may be possible to manage individual

16

issues through the use of surveys and statistical sampling. Statistical methods cannot entirely substitute for common proof, however. There must be some glue that binds class members together apart from statistical evidence. While sampling may furnish indications of an employer's centralized practices [citation], no court has 'deemed a mere proposal for statistical sampling to be an adequate evidentiary *substitute* for demonstrating the requisite commonality, or suggested that statistical sampling may be used to manufacture predominate common issues where the factual record indicates none exist.'" (*Duran, supra,* 59 Cal.4th at p. 31, quoting *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 998.) "If statistical evidence will comprise part of the proof on class action claims, the court should consider *at the certification stage* whether a trial plan has been developed to address its use. A trial plan describing the statistical proof a party anticipates will weigh in favor of granting class certification if it shows how individual issues can be managed at trial." (*Duran,* at pp. 31-32.) However, the Court cautioned, "a class action trial management plan may not foreclose the litigation of relevant affirmative defenses, even when these defenses turn on individual questions." (*Id.* at p. 34.)

Shortly after issuing *Duran,* the Court again addressed predominance issues in the context of a wage and hour class action in *Ayala, supra,* 59 Cal.4th 522. In *Ayala* several newspaper carriers sued the local newspaper that hired them alleging the newspaper had improperly classified them as independent contractors and thus denied them the wage and hour protections to which they were entitled. (*Id.* at 528.) The trial court denied certification of a class based on its belief the central question whether the carriers were employees or independent contractors could not be resolved without "numerous unmanageable individual inquiries into the extent to which each carrier was afforded discretion in his or her work." (*Ibid.*) The Court of Appeal disagreed; the Supreme Court granted review and affirmed the decision of the Court of Appeal. According to the Supreme Court, the trial court erred in rejecting certification "based not on [the newspaper's] right to exercise control, but on variations in how that right was exercised . . . ." (*Ibid.*)

17

Rephrasing this inquiry, the Court stated, "at the certification stage, the relevant inquiry is not what degree of control [the newspaper] retained over the manner and means of its papers' delivery. It is, instead, a question one step further removed: Is [the newspaper's] right of control over its carriers, whether great or small, sufficiently uniform to permit classwide assessment? That is, is there a common way to show [the newspaper] possessed essentially the same legal right of control with respect to each of its carriers? Alternatively, did its rights vary substantially, such that it might subject some carriers to extensive control as to how they delivered, subject to firing at will, while as to others it had few rights and could not have directed their manner of delivery even had it wanted, with no common proof able to capture these differences?" (*Ayala*, *supra*, 59 Cal.4th at pp. 533-534.) To answer these questions, the Court turned to the form contracts signed by the carriers, which spelled out the degree of control retained by the newspaper. At the certification stage, the Court stated, "the importance of a form contract is not in what it says, but that the degree of control it spells out is uniform across the class." (*Id.* at p. 534.)

*Ayala* thus cautions courts to avoid focusing on the inevitable variations inherent in tracing the actions of individuals and to instead focus on the policies—formal or informal—in force in the workplace. As the Court explained, "Evidence of variations in how work is done may indicate a hirer has not exercised control over those aspects of a task, but they cannot alone differentiate between cases where the omission arises because the hirer concludes control is unnecessary and those where the omission is due to the hirer's lack of the retained right. That a hirer chooses not to wield power does not prove it lacks power." (*Ayala, supra,* 59 Cal.4th at p. 535.)

b. *Application of these principles to the overtime claim in this litigation*

The theory of liability in this litigation—that, by classifying all managerial employees as exempt, JCS violated mandatory overtime wage laws—is, to paraphrase *Brinker*, "by nature a common question eminently suited for class treatment." (*Brinker, supra,* 53 Cal.4th at p. 1034.) Indeed, significant common issues pervade this litigation. For instance, CAI operates a chain of restaurants governed by the same policies and

18

procedures, many of which are promulgated in employee handbooks and training manuals. In addition, exempt employees are expected to work a minimum of 50 hours per week, another common issue that disposes of the need to assess whether employees worked sufficient hours to earn overtime compensation in any particular week. The parties have identified a finite task list, suggesting that jobs within JCS were "highly standardized" (*Duran, supra,* 59 Cal.4th at p. 31 [citing one of the reasons class certification was appropriate in *Sav-On*]); and many of the tasks performed by assistant managers are identical to those performed by nonexempt employees. JCS also uses explicit guidelines for budgeting staffing; and employee job performance is evaluated using standard forms, thus clarifying if an employee meets JCS's expectations for the position.

As in *Heyen*, the gist of plaintiffs' claim here is that, regardless of the patina of managerial discretion expressed in their job description, they functioned consistently as utility workers, cross-trained in all tasks, who could be assigned to fill in where needed without affecting the labor budget or requiring overtime compensation.[16] The crux of the matter, therefore, lies in whether a typically nonexempt task becomes exempt when performed by a managerial employee charged with supervision of other employees.[17] It

---

[16]     Like plaintiffs here, Linda Heyen had sought certification of a class of assistant managers who allegedly had been improperly classified as exempt employees. Her claim was tried individually after the trial court's denial of class certification (*Heyen, supra,* 216 Cal.App.4th at p. 799) and illustrates the enormous cost of resolving these claims on an individual, rather than a classwide, basis.

[17]     "[T]ask classification is a mixed question of law and fact appropriate for a court to address separately from calculating the amount of time specific employees actually spend on specific tasks." (*Sav-On*, *supra,* 34 Cal.4th at p. 330.) Relying on IWC Wage Order No. 4 (mercantile workers) and related FLSA regulations, our colleagues in Division Four of this court summarized in *Heyen* the analogous inquiry as to whether a grocery store assistant manager was properly classified as an exempt employee: "Several general principles emerge from these regulations. First, work of the same kind performed by a supervisor's nonexempt employees generally is 'nonexempt,' even when that work is performed by the supervisor. If such work takes up a large part of a supervisor's time, the supervisor likely is a 'nonexempt' employee. [Citations.] [¶] Second, the regulations do not recognize 'hybrid' activities—i.e., activities that have both 'exempt'

19

is this inquiry CAI and Landry contend creates the necessity for individual mini-trials that would make trial of this claim unmanageable on a classwide basis. We recognize an inquiry into whether a task is "helpful in supervising the employees or contribute[s] to the smooth functioning of the department" is nearly impossible in hindsight. However, as the Supreme Court warned in *Sav-On*, "Any dispute over 'how the employee actually spends his or her time' [citation] . . . has the potential to generate individual issues. But considerations such as 'the employer's realistic expectations' [citation] and 'the actual overall requirements of the job,' [citation] are likely to prove susceptible of common proof." (*Sav-On, supra,* 34 Cal.4th at pp. 336-337; see *Duran, supra,* 59 Cal.4th at p. 52 ["[I]n recognizing that California's definition of an outside salesperson is quantitative in nature, *Ramirez* did not say that the test boils down to whether a particular employee actually spends more than 50 percent of his or her working hours on outside sales.

---

and 'nonexempt' aspects. Rather, the regulations require that each discrete task be separately classified as *either* 'exempt' or 'nonexempt.' [Citations.] [¶] Third, identical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization or department. Understanding the manager's purpose in engaging in such tasks, or a task's role in the work of the organization, is critical to the task's proper categorization. A task performed because it is 'helpful in supervising the employees or contribute[s] to the smooth functioning of the department' is exempt, even though the identical task performed for a different, nonmanagerial reason would be nonexempt. [Citations.] [¶] Finally, in a large retail establishment where the replenishing of stocks of merchandise on the sales floor 'is customarily assigned to a nonexempt employee, the performance of such work by the manager or buyer of the department is nonexempt.' [Citation.] Similarly, in such a large retail establishment, a manager's participation in making sales to customers is nonexempt, unless the sales are made for 'supervisory training or demonstration purposes.'" (*Heyen, supra,* 216 Cal.App.4th at pp. 822-823.)

Applying these principles to the tasks identified by CAI and Landry's, inventory, restocking, serving, cooking, bussing tables, cleaning and other tasks ordinarily performed by nonexempt employees remain nonexempt when performed by a managerial employee. Likewise, when a managerial employee fills in for a nonexempt employee, the task remains nonexempt. On the other hand, if the managerial employee is performing a particular task for the purpose of supervisory training or to ensure the smooth functioning of the restaurant, the task is exempt. California law does not recognize a hybrid category in which the employee is deemed to be performing an exempt task at the same time he or she is performing a nonexempt task. (*Heyen, supra,* 216 Cal.App.4th at p. 826.)

20

Instead, the ultimate question is: what are 'the *realistic* requirements of the job'?"] (conc. opn. of Liu, J.); *Sotelo v. Medianews Group, Inc*. (2012) 207 Cal.App.4th 639, 654 ["[a] class . . . may establish liability by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work overtime hours without overtime pay, or to miss rest/meal breaks"].)[18]

In short, courts in overtime exemption cases must proceed through analysis of the employer's realistic expectations and classification of tasks rather than asking the employee to identify in retrospect whether, at a particular time, he or she was engaged in an exempt or nonexempt task. For instance, the *Sav-On* Court observed the defendant had "allegedly promulgated exempt job descriptions, but implemented policies and practices that failed to afford its [managerial employees] true managerial discretion, and standardized store operations so that managers were obliged to spend over 50 percent of their time doing the same tasks as their subordinates." (*Id.* at p. 337.) The court here must ask whether JCS's realistic expectations and the actual requirements of the job resulted in the exercise of supervisorial discretion by managerial employees or instead relegated employees to the utility role described above. Conceivably, were the court to

_____

[18]    We made a similar point in *Ghazaryan v. Diva Limousine Ltd.* (2008) 169 Cal.App.4th 1524, 1536: "The record before the trial court on the class certification motion established . . . that individual drivers accumulate gap time at varying rates and utilize that time in different ways. But the record also reveals Diva dictates to a large extent how drivers use their on-call time. Diva distributes an official "Chauffeur's Handbook" to all drivers, which expressly bars personal use by drivers of Diva's vehicles (albeit Diva appears to ignore incidental errands within a geographically proximate area), requires drivers to respond promptly to dispatch calls and accept trip assignments absent pre-arranged circumstances, requires drivers to be in full uniform while in or proximate to their vehicles, and requires drivers to clean and maintain their vehicles during their on-call time. Those limitations apply across the board to all drivers who have on-call time during the course of a day. Although individual testimony may be relevant to determine whether these policies unduly restrict the ability of drivers as a whole to utilize their on-call time for personal purposes, the legal question to be resolved is not an individual one. To the contrary, the common legal question remains the overall impact of Diva's policies on its drivers, not whether any one driver, through the incidental convenience of having a home or gym nearby to spend his or her gap time, successfully finds a way to utilize that time for his or her own purposes." (Fn. omitted.)

find JCS's expectations for certain groups of managerial employees unrealistic, no further inquiry would be required to establish liability.

More likely, however, is the prospect that some evidence will be required relating to how individual employees spent their time. In this respect statistical sampling may provide assistance in identifying the realistic demands of the job and illuminating whether the typical employee was able to meet those expectations. After *Duran* it is clear the outright rejection of statistical sampling as evidence to support a plaintiff's proof of liability is improper so long as the proposed sampling plan accords the employer an opportunity to prove its affirmative defenses. (*Duran, supra,* 59 Cal.4th at p. 40.) The statistical sampling plan proposed by plaintiffs below lacked the specificity contemplated in *Duran*. Based on the reasoning of *Duran*, we would expect the plaintiffs to submit a revised plan upon remand that more adequately addresses the concerns expressed by the Supreme Court.

Nonetheless, by accepting defendants' argument and focusing on the employee's ability (or lack thereof) to identify what tasks he or she performed and for what purpose, the trial court failed to consider *Sav-On's* explicit direction on issues of proof in such cases: "Contrary to defendant's implication, our observation in *Ramirez* that whether the employee is an outside salesperson depends 'first and foremost, [on] how the employee actually spends his or her time' (*Ramirez,* [*supra,* 20 Cal.4th at p. 802]) did not create or imply a requirement that courts assess an employer's affirmative exemption defense against every class member's claim before certifying an overtime class action. [¶] [D]efendant's proposed reading of *Ramirez* would require, essentially, that a certification proponent in an overtime class action prove the entire class was nonexempt whenever a defendant raises the affirmative defense of exemption. But in *Ramirez* itself we recognized that 'the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption.' [Citations.] Were we to require as a prerequisite to certification that plaintiffs demonstrate defendant's classification policy was, as the Court of Appeal put it, either 'right as to all members of the class or wrong as to all members of the class,'

22

we effectively would reverse that burden. *Ramirez* is no authority for such a requirement, nor does the logic of predominance require it." (*Sav-On, supra,* 34 Cal.4th at pp. 337-338.) Nothing in *Duran* undermines this fundamental point.

     5.  *The Trial Court Must Reconsider Whether Class Certification Provides a Superior Method of Resolving Plaintiffs' Claim*

We have not ignored the substantial case authority, including our own, upholding trial court decisions not to certify class actions for claims similar to those raised here (see, e.g., *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974; *Mora v. Big Lots Stores, Inc., supra,* 194 Cal.App.4th 496; *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723); nor do we express any disagreement with the outcome of those cases. However, we understand from *Brinker*, *Duran* and *Ayala* that classwide relief remains the preferred method of resolving wage and hour claims, even those in which the facts appear to present difficult issues of proof. By refocusing its analysis on the policies and practices of the employer and the effect those policies and practices have on the putative class, as well as narrowing the class if appropriate, the trial court may in fact find class analysis a more efficient and effective means of resolving plaintiffs' overtime claim.

## DISPOSITION

The order denying class certification is reversed, and the cause is remanded for proceedings not inconsistent with this opinion. Plaintiffs are to recover their costs on appeal.


                            PERLUSS, P. J.


We concur:



     WOODS, J.                     SEGAL, J.[*]

---

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.