Filed 10/9/20  Union Bank Wage and Hour Cases CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UNION BANK WAGE AND HOUR CASES (Coordinated) | B295835 |
| TIMOTHY BEATY, | (Los Angeles County Super. Ct. Nos. BC596544 JCCP4866) |
| Plaintiff and Appellant, | |
| v. | |
| UNION BANK N.A. et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ann I. Jones, Judge.  Affirmed.

Matern Law Group, Matthew J. Matern, Andrew J. Sokolowski and Tagore O. Subramaniam for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Derek R. Havel, Matthew A. Tobias, Hilary A. Habib and Natasha L. Domek for Defendants and Respondents.

---

## INTRODUCTION

Plaintiffs and appellants Timothy Beaty and Natasha Cruz separately filed class action lawsuits asserting wage and hour claims against their former employer, defendant and respondent MUFG Union Bank, N.A., formerly known as Union Bank, N.A. (Union Bank). After their actions were coordinated, plaintiffs sought to certify an overarching class of all non-exempt employees who worked at defendant's California call centers at any time between October 2, 2011 and the date of class certification. Plaintiffs also sought to certify several subclasses of non-exempt employees; five of those subclasses are at issue here.

The "Minimum Wage and Overtime" subclass included customer service representatives (CSRs) allegedly subject to a policy denying them pay for time they spent logging into and out of their computers. The "On-Premises Rest Period" subclass included CSRs allegedly subject to a policy prohibiting them from leaving the premises during their rest periods. The "Third Rest Period" and "Second Meal Period" subclasses included CSRs allegedly subject to policies denying them a third rest period and second meal period during shifts exceeding 10 hours. Finally, the "Derivative Claims" subclass included all CSRs; plaintiffs alleged defendants would be liable to this subclass if any of plaintiffs' other theories prevailed.

The trial court denied class certification. It concluded that plaintiffs failed to carry their burden of demonstrating a well-defined community of interest because individual questions

2

predominated as to each of the substantive subclasses, plaintiffs were not typical of the Third Rest Period and Second Meal Period subclasses, and plaintiffs were not adequate representatives of all three meal and rest period subclasses.  The trial court further concluded that plaintiffs failed to demonstrate that a class action was a superior and manageable means of adjudicating their claims.

Plaintiffs contend the trial court erred in declining to certify their proposed subclasses. They contend the trial court erroneously concluded there was no substantial evidence of a uniform policy requiring off-the-clock work by the Minimum Wage and Overtime Subclass, disregarded their policy-based theories of liability for the rest and meal period subclasses, erroneously concluded that plaintiffs were not typical or adequate representatives for the rest and meal period subclasses, and erred in rejecting their proposed trial plan as unmanageable.

We affirm.  Although the trial court erred in connection with some of its predominance and adequacy determinations, its typicality finding was appropriate.  Additionally, the trial court's conclusion that plaintiffs failed to demonstrate that their claims and defenses thereto could be managed efficiently at trial was supported by the record and well within the trial court's discretion.

## FACTUAL BACKGROUND

Defendant is a bank that serves individual and business customers.  Defendant formerly operated customer service call centers in Brea and Monterey Park; it relocated those call centers outside of California in approximately June 2014.  Plaintiff Timothy Beaty worked as a CSR at the call centers between 2007 and January 4, 2013.  Plaintiff Natasha Cruz worked as a CSR

3

and online banking specialist at the call centers beginning in November 2005, and ended her career with Union Bank as a senior teller in Tehachapi on July 5, 2013.

CSRs who worked in the call centers were responsible for taking inbound calls from Union Bank customers. CSRs used computers and at least five different software programs to perform their duties; they had to log in to the computers and the programs at the beginning of their shifts. One of the software programs, Softphone, was used to route, handle, and track customer calls.

To ensure that calls were routed to available representatives, CSRs updated their "agent states" in Softphone throughout the day. Agent states included "Logged Out," "Call Inbound," "Call Outbound," "Wait for Next Call," "Not Ready for Next Call," "Call on Hold," and "After Call Work." CSRs could select a reason explaining at least some of the agent states from a drop-down menu. Reasons included "Email," "Training," "Meeting," "Project," "Coaching," "System Problem," "Break," and "Lunch." All of a CSR's daily log-ins, agent state updates, and log-outs in Softphone were recorded in an "Agent States Report."

Despite the detailed nature of the Agent States Reports, defendant did not use them to record employees' work time or for other payroll purposes.[1] Instead, defendant relied on separate time cards, which were handwritten until approximately December 14, 2013 and computerized thereafter. Employees

---

[1]One of defendant's designated persons most knowledgeable (PMK) testified that defendant considered a CSR's "adherence," or "overall average of time you're on your phone and you're adhering to your breaks and lunches and your schedule for the day" as a performance metric.

manually completed the time cards under both systems, and were required to verify that their time entries were accurate. Defendant submitted several declarations indicating there was no such verification requirement for the entries made on Softphone. The employees who provided those declarations asserted they "did not need to track exactly which activity I was engaged in or be as precise as I was when filling out my timecards."

Defendant had written policies addressing timekeeping and punctuality. They will be discussed below, along with defendant's rest and meal period policies.

## PROCEDURAL HISTORY

### I.  *Complaints and Coordination*

On October 2, 2015, plaintiff Beaty filed a wage and hour class action against defendant in Los Angeles Superior Court. Beaty's complaint asserted nine causes of action against defendant: failure to provide required meal periods, failure to authorize and permit required rest breaks, failure to pay overtime wages, failure to pay the minimum wage, failure to pay all wages due to separating employees, failure to maintain required records, failure to furnish accurate itemized wage statements, failure to indemnify employees for necessary expenditures incurred in the discharge of their duties, and unfair and unlawful business practices. Beaty filed a first amended complaint asserting the same causes of action on January 29, 2016.

On October 8, 2015, six days after Beaty filed his original complaint, plaintiff Cruz filed a similar class action complaint against defendant in San Francisco Superior Court. She asserted five causes of action: failure to pay wages owed, failure to pay

overtime compensation, failure to maintain accurate records and provide itemized wage statements, failure to pay all wages due upon termination, and unfair and unlawful business practices.

Defendant filed a petition to coordinate the cases on March 21, 2016. The Judicial Council granted the petition, and the coordinated proceeding was assigned to Los Angeles Superior Court in August 2016.

II. *Motion for Class Certification*

Plaintiffs jointly moved for class certification on March 2, 2018. They sought to certify a class of "All non-exempt employees who worked at one of Defendants'[2] call centers in California at any time between October 2, 2011 and the date of class certification, as determined by Defendants' records." Plaintiffs also sought to certify seven subclasses, including the five at issue in this appeal. Defendant opposed the motion.

A. *Minimum Wage and Overtime Subclass*

1. *Plaintiffs' Arguments and Evidence in Support*

Plaintiffs alleged defendant violated Labor Code sections 510 and 1194 by failing to pay class members for all hours worked. Specifically, they alleged they were required to be logged in to their computers and software programs and ready to take calls the moment their shifts started, which necessitated logging in prior to the start of their shifts. Similarly, they alleged they were required to remain ready to take calls until their shifts ended, and therefore had to log out of their computers and software programs after their shifts ended. Plaintiffs alleged they

---

[2]Plaintiffs named MUFG Union Bank, N.A. and Union Bank, N.A. as separate entities and defendants. They accordingly use the plural "defendants" in their class certification papers.

6

were not paid for the time they spent logging in and logging out of their computer systems, which defendant's PMK testified was "actually work time." Plaintiffs sought to certify a Minimum Wage and Overtime subclass of "All non-exempt employees who worked as a customer service representative at one of Defendants' call centers in California at any time between October 2, 2011 and the date of class certification, as determined from Defendants' records."

To support certification of this class, plaintiffs cited the "Attendance & Punctuality" policy contained in defendant's 2006 Employee Handbook. It stated in relevant part: "Good attendance and punctuality are expected of employees at Union Bank. You are responsible for adhering to your scheduled hours. Frequent or excessive absences or tardiness create a hardship for your branch or department and should be avoided. Nonexempt employees should arrive ready for work at their scheduled starting time, return from lunch and breaks promptly, and work until the work period ends." In connection with a subclass not currently at issue, and in their appellate briefing concerning this subclass, plaintiffs also pointed to a document entitled "Scheduling" from the "RCS New Hire Orientation." Plaintiffs did not identify the "Scheduling" document as supportive of this subclass in their motion for class certification, and the trial court did not consider it, so we do not discuss it here.

Plaintiffs presented declarations and deposition testimony from Beaty and Cruz, both of whom testified that they needed to arrive "well before" the start of their shifts to log in to their computers and software programs and "have everything ready to go." Cruz estimated she had to arrive "between three to five minutes early," while Beaty estimated he spent "between five and

7

seven minutes" each day logging in to his computer prior to his scheduled work time. Beaty further testified that, during "the middle" of his tenure with Union Bank, his manager told him something to the effect of, "If you're on time, you're late. If you're early, you're just on time." Plaintiffs characterized that statement as a summary of defendant's policy.

Putative class member Iliana Mena stated in a declaration that she was asked "every day" to "perform work before logging in to my computer at the beginning of a shift, and after logging out at the end of a shift," including "resolving online banking issues, wires, and assisting other employees." Mena also stated that she "was required to remain working until my scheduled shift end time," then had to spend approximately 10 minutes each day shutting down her computer after she logged out. Plaintiffs asserted that Beaty and Cruz gave similar testimony about logging out of their computers, but the declarations and deposition excerpts they cited do not support this assertion.

Plaintiffs asserted that the Agent States Reports would confirm they logged into and out of their computers outside of their scheduled work hours and therefore performed off-the-clock work. Plaintiffs' expert, Eric Lietzow compared the Agent States Reports and time cards of five employees selected by plaintiffs' counsel, including Cruz, and found disparities between the Agent States Reports and time cards in many of the 1,626 total shifts he analyzed. Plaintiffs asserted that Lietzow could perform the same analysis across all class members to determine the amount of unpaid minimum wages and overtime.

2.      *Defendant's Arguments and Evidence in Opposition*

Defendant contended the Minimum Wage and Overtime subclass was not suitable for class treatment because its policies and training materials required accurate recording of time and prohibited off-the-clock work.  It asserted that these "clear, written policies" left plaintiffs "to speculate that there was a clandestine practice—somehow uniformly applied by scores of unidentified supervisors at two separate call centers—to disregard policies and secretly force employees to work off the clock."  Defendant further argued that individual questions predominated, because plaintiffs would have to show that particular supervisors instructed particular employees to work off-the-clock, whether each employee in fact worked off-the-clock, whether any off-the-clock work was de minimis, and whether defendant was aware or should have been aware of particular off-the-clock work.

In support of these contentions, defendant offered declaration testimony from both management and potential class members asserting that it had a policy of requiring CSRs to accurately record all of their work hours, including the start and end times of their shifts.  It further submitted evidence that it had policies "distributed at orientation and available on Union Bank's intranet" that strictly prohibited off-the-clock work and defined hours worked to include "any time spent on electronic devices for business purposes."  Defendant provided the court with wage and hour training materials CSRs were required to complete, and testimony of class members indicating that they understood it was against defendant's policy to work off the clock.  Defendant specifically pointed to Cruz's deposition, during which

9

she testified that she understood that she was required to accurately record all time worked, including start and stop times, that hours worked included "all time that you are required to be on duty or required to be on your employer's property or at a certain place of work," and that "[h]ours worked can also include all time outside your normal shift when you are allowed to actually perform work for your employer."

Defendant also contended the Agent States Reports were unreliable and should not be considered because they did not show the time CSRs actually worked and CSRs were not required to be precise when selecting agent states in Softphone. As examples, defendant pointed to Agent States Reports containing egregious errors, such as 13 meal or rest period agent states in a single shift, "Lunch" states lasting several hours, and multiple entries showing beginnings of a single shift. Defendant further contended that plaintiffs' expert analysis of the Agent States Reports was "fatally flawed" due to the small sample of only five of the approximately 180 potential class members. In the alternative, defendant presented its own expert analysis, by Stefan Boedeker, which compared 10,025 Agent States reports and time cards. Boedeker's analysis showed that 78.2 percent of all Agent States Reports reflected a log-in time at or after the time written on an employee's time card, and 56.7 percent reflected a log-out time before or at the time written on the time card.

### 3. *Plaintiffs' Reply*

Plaintiffs disputed defendant's characterization of their theory of liability as speculation of a clandestine practice of requiring off-the-clock work. Plaintiffs asserted that the "'practice' of requiring or, at minimum encouraging, off-the-clock work was not clandestine. . . . Defendants' written policy

10

required that employees adhere to their *scheduled* hours, which pressured employees to work off-the-clock so that their time records reflected their schedule instead of their actual working time." They further asserted that there was "a confluence of pressures from Defendants' various policies and directives that exerted pressure to work off the clock and that resulted in off-the-clock work about which Defendants were aware."

B.      *On-Premises Rest Period Subclass*

1.      *Plaintiffs' Arguments and Evidence in Support*

Plaintiffs alleged that defendant violated Labor Code section 226.7, subdivision (c) by restricting how they spent their rest period time. Plaintiffs relied on a document entitled "Completing the Employee Time Card" from the "RCS New Hire Orientation" materials dated 4/28/17.[3] It stated in relevant part, "It is not permissible to leave the bank premises during breaks." Plaintiffs asserted "[t]his is consistent with all other written polices, which fail to advise employees that they can leave the premises for their rest breaks." They also pointed to deposition testimony from one of defendant's PMKs, who stated, "I didn't know of anybody who left the call center. It's only 15 minutes during the break[;] I saw people go outside and smoke a cigarette. I never observed anybody leaving." Plaintiff Beaty testified that he did "not recall being authorized to leave the company premises during my rest break," and putative class member Mena testified that she "was not allowed to leave the premises during my rest breaks."

---

[3]Defendant's PMK agreed during her deposition that "as far as the policy for completing the timecard that you're aware of, [this was] the policy that's been in effect between October 2011 and the present."

11

Plaintiffs asserted that the question of whether defendant's policy was lawful was "a common one susceptible to class treatment." They sought to certify an On-Premises Rest Period subclass of "All non-exempt employees who worked as a customer service representative at one of Defendants' call centers in California at any time between October 2, 2011 and the date of class certification, and worked at least one shift of more than three and one-half hours, as determined by Defendants' records."

2. *Defendant's Arguments and Evidence in Opposition*

Defendant argued that plaintiffs failed to establish that it had a uniform policy of prohibiting CSRs from leaving its premises during rest breaks. It disputed that the orientation document plaintiffs relied on was a policy document,[4] and further contended that the document was not distributed to all class members. Defendant contended that the rest period policy in its Human Resources Manual did not require CSRs to stay on the premises, and proffered testimony from several supervisors and CSRs that CSRs were allowed to leave during their rest periods.

3. *Plaintiffs' Reply*

Plaintiffs contended that defendant impermissibly challenged the merits of their On-Premises Rest Period claim. They further contended that the issue was "inherently certifiable" and could be resolved via motions practice.

---

[4]Notably, in support of the Third Rest Period subclass, plaintiffs proffered deposition testimony from defendant's PMK that "any policy that Defendants had would be in writing in either the human resources manual guide, the employee policy guide, or the employee handbook." Defendant pointed to declaration testimony from the same PMK here "confirm[ing] this document is not a policy document."

12

C.   *Third Rest Period Subclass*

1.   *Plaintiffs' Arguments and Evidence in Support*

Plaintiffs alleged that defendant violated Industrial Welfare Commission Wage Order No. 4 (Cal. Code Regs., tit. 8, § 11040, subd. 12(A)) because it lacked a policy requiring a third rest period for shifts that exceeded 10 hours. They contended that defendant's policies regarding rest periods did not provide for a third rest period during shifts exceeding 10 hours and failed to give full effect to the language of Wage Order No. 4 requiring a rest period for each four hours worked or "major fraction" thereof. Plaintiffs pointed to the 2006 Employee Handbook, which provided, "Nonexempt employees are required to take a break for each four hours they work if scheduled to work at least 3½ hours. This will be paid time." Plaintiffs also cited defendant's Human Resources Manual, which they acknowledged "track[s] some of the language of the Wage Order." Specifically, it provided, "Nonexempt employees must be permitted to take a paid 15 minute rest break for every 4 hours or major fraction thereof (a major fraction is ordinarily considered more than 2 hours worked within a 4 hour period). As far as it is practical, the rest period should be in the middle of each 4 hour work period (or major fraction thereof). Exceptions to the rest period requirements are allowed only if the total daily time worked is less than 3 and one-half hours."

However, plaintiffs pointed out that the manual also contained a chart stating that employees working "More than 10, but less than 12" hours were only entitled to two paid rest periods. In addition, putative class member Mena stated in her declaration that she "often was not permitted to take a . . . third

13

ten-minute rest break" when she worked a shift exceeding 10 hours and was unaware she was entitled to one.

Plaintiffs argued that the effect of the policy was susceptible to common proof:  the Agent States Reports, which include employee-inputted reasons of "Break."  Plaintiffs' expert Richard Drogin, Ph.D., analyzed Agent States Reports from a 20 percent class sample selected by defendant. He found that 325 of the 15,305 shifts documented in the sample Agent States Reports exceeded 10 hours.  Of those, 243, or 78 percent, did not contain a third "Break" entry.

Based on this evidence, plaintiffs sought to certify a "Third Rest Period Subclass" of "All non-exempt employees who worked as a customer service representative at one of Defendants' call centers in California at any time between October 2, 2011 and the date of class certification, and worked at least one shift of more than ten hours, as determined from Defendants' records."

2.     *Defendant's Arguments and Evidence in Opposition*

Defendant argued that plaintiffs failed to demonstrate that it had a policy of denying third rest periods to CSRs who worked shifts longer than 10 hours.  Defendant asserted that the chart in its Human Resources Manual contained "a typo," and emphasized that the actual text of the policy correctly stated that employees were entitled to one rest period for every four hours of work or major fraction thereof.  Defendant also argued that the Wage Order posted at its call centers stated the correct policy, as did the wage and hour training that CSRs, including plaintiffs, completed.

Defendant presented declaration evidence from CSRs who stated that they understood defendant's rest period policy and

took their rest periods.  To the extent any class members may have missed rest periods, defendant asserted that individualized inquiry would be necessary to show who missed rest periods, when, why, and whether the CSR submitted a request for a compensatory rest period premium.

    3. *Plaintiffs' Reply*

Plaintiffs reiterated that defendant's policy—the chart in the Human Resources Manual—was facially defective and in conflict with the Wage Order defendant purportedly posted.

   D. *Second Meal Period Subclass*

    1. *Plaintiffs' Arguments and Evidence in Support*

Plaintiffs alleged that defendant violated Labor Code section 512 by failing to have a policy providing nonexempt employees who worked shifts longer than 10 hours with a second 30-minute meal period.  They asserted that the 2006 Employee Handbook, which states that "[e]mployees working more than five hours must also take a meal period break of at least 30 minutes which is unpaid time," "fails to include any language indicating that employees are eligible for a second meal period for shifts longer than ten hours."[5]

Expert Drogin "analyzed Defendants' Agent States Reports regarding 'away states' for second meal periods," an analysis similar to the one he used on the same sample in connection with

---

[5]Plaintiffs ignored the Human Resources Manual, an excerpt of which they provided in support of the Third Rest Period subclass explicitly stated, "Nonexempt employees will receive a second unpaid meal period of at least 30 minutes if the employee works more than 10 hours," and indicated the same in a chart.  Defendant cited this portion of the Human Resources Manual in its opposition, but the trial court did not mention it in its analysis of the Second Meal Period subclass.

the Third Rest Period subclass.  Drogin found that 324 of the 325 sample shifts that exceeded 10 hours did not have an Agent States Report entry documenting a second "Lunch."

Based on this evidence, plaintiffs sought to certify a Second Meal Period subclass consisting of "All non-exempt employees who worked as a customer service representative at one of Defendants' call centers in California at any time between October 2, 2011 and the date of class certification, and worked at least one shift of more than ten hours, as determined from Defendants' records."

2.    *Defendant's Arguments and Evidence in Opposition*

Defendant contended plaintiffs failed to carry their burden of establishing a common question regarding the Second Meal Period subclass, because its polices expressly state that employees who work a 10-hour shift are entitled to a second meal period.  It further argued that expert Drogin's analysis was flawed due to his reliance on the Agent States Reports and failure to account for meal period waivers.  Defendant proffered testimony expert Boedeker, who analyzed over 20,000 shifts using time card data and considered meal period waivers; he found only 11 violations.  Defendant additionally proffered testimony from several CSRs, who stated that they were given the opportunity to take a second meal period but chose not to do so in order to leave work earlier.  Defendant argued that the meal period waivers established an affirmative defense, and that individualized inquiry into each CSR's waiver would be required.

3.    *Plaintiffs' Reply*

Plaintiffs rejected defendant's contention that its affirmative defense of meal period waivers necessitated

16

unmanageable individualized inquiry. In plaintiffs' view, the affirmative defense "raises a *single common question* applicable to all class members: did s/he sign a meal period waiver or not?"

E. *Derivative Claims Subclass*

Plaintiffs alleged that their claims for failure to pay all wages to separating employees, wage statement violations, and unfair business practices were derivative of their other subclasses. That is, defendant could also be liable under Labor Code sections 203 and 226, subdivision (a), or Business and Professions Code section 17200 if plaintiffs successfully proved liability on one of their other theories. They accordingly sought to certify a Derivative Claims subclass of "All non-exempt employees who worked as a customer service representative at one of Defendants' call centers in California at any time between October 2, 2011 and the date of class certification, as determined from Defendants' records."

Defendant argued that the Derivative Claims subclass should not be certified because plaintiffs' primary claims were not amenable to class treatment.

F. *Other Class Certification Requirements*

1. *Typicality and Adequacy*

Plaintiffs contended their claims were typical of those of the class because they were "based on the same legal theories and arise out of Defendants' same unlawful policies and practices," and plaintiffs "suffered injuries typical of the class members." They also contended they satisfied the adequacy requirement because they were represented by well-qualified counsel and their interests were not antagonistic to or in conflict with those of other class members.

17

Defendant contended that plaintiffs failed to satisfy the typicality and adequacy requirements for class certification. It argued that plaintiffs Beaty and Cruz were not typical of the Third Rest Period and Second Meal Period subclasses, because their time cards showed that they never worked a shift longer than 10 hours. Defendant also argued that plaintiffs were not adequate representatives of the class because some class members were "lead" CSRs responsible for ensuring that other CSRs were given their meal and rest periods, and "[t]his creates irreconcilable intra-class conflicts that preclude certification."

In reply, plaintiffs argued that plaintiff Beaty was typical of the Third Rest Period and Second Meal Period subclasses, because one of his time cards showed he worked a shift that was either 10 hours or 12 hours and, under either scenario, he worked more than 10 hours due to the off-the-clock time he spent logging into and out of his computer. They also contended they were adequate representatives because their theories of liability on the meal and rest period claims turned on corporate policies, not decisions made by lead CSRs.

2. *Trial Plan*

At the certification stage, plaintiffs using statistical evidence also must prepare a trial plan addressing the use of statistical evidence and demonstrating how individual issues can be managed at trial. (*Duran v. U.S. Bank National Association* (2014) 59 Cal.4th 1, 31-32 (*Duran*).) Plaintiffs filed a 10-page trial plan concurrently with their motion for class certification. The first step of plaintiffs' plan was summary adjudication of the liability questions presented by each of their subclasses. If material factual disputes prevented summary adjudication, plaintiffs proposed that liability and damages for each subclass

18

be adjudicated at trial as follows. For the Minimum Wage and Overtime subclass, plaintiffs proposed calling as witnesses two of defendant's PMKs, "as well as Plaintiffs and other class members to establish Defendants' time keeping practices." Then, to determine liability and damages, "a jury need only analyze the shift start/end times . . . and compare them with the activity tracked through Softphone on the Agent States Reports. Where the Agent States Reports evidence that an employee was punched in to the Softphone system before or after the start and end times on their time cards, this would reflect uncompensated time. . . . Given a full set of data before trial—including time cards and Agent States Reports for all Class members—Plaintiffs' expert would be able to measure total uncompensated time." For the On-Premises Rest Period subclass, plaintiffs asserted that the illegality of the policy itself would establish liability. They also planned to elicit "testimony from Defendants' witnesses" that defendant did not pay rest period premiums, and asserted that "Defendants' time records can be easily analyzed to determine which shifts qualify for one or more rest breaks and calculate damages using payroll data . . . ."

Plaintiffs also asserted that defendant's liability for the Third Rest Period subclass could be determined by the facially illegal chart in the Human Resources Manual. They contended that Agent States Reports for "Break" entries, class member testimony, and expert analysis could confirm that class members who worked shifts of 10 hours or more were not provided with third rest breaks. Plaintiffs made similar contentions with respect to the Second Meal Period subclass: the policy failed to provide a second meal period, and analysis of Agent States Reports could confirm that and establish damages.

19

Plaintiffs' trial plan did not mention affirmative defenses or specify the identities of the class members or experts they planned to call as witnesses. Plaintiffs estimated trial would last "at least 10-15 days."

Defendant contended that plaintiffs' trial plan was inadequate. It argued that the plan focused too much on the possibility of summarily adjudicating liability issues before trial and too little on how plaintiffs planned to manage the litigation of issues at trial. Defendant further asserted that the plan was "woefully vague," failed to demonstrate how individual issues would be managed, relied on flawed expert analyses, and violated its due process rights by failing to account for affirmative defenses.

III.   *Hearing and Ruling*

The trial court heard the class certification motion on December 19, 2018. It issued a lengthy written ruling denying the motion the following day.

After finding that plaintiffs satisfied the numerosity and ascertainability elements, which were not contested, the trial court considered whether they carried their burden of demonstrating a community of interest with respect to each of the proposed subclasses. In all cases, it found they did not.

A.   *Minimum Wage and Overtime Subclass*

The trial court described plaintiffs' theory of liability as, "Defendant failed to pay for all time worked, such as time spent by CSRs booting up, logging on and off, and shutting down their computers." It summarized plaintiffs' evidence, including the policy regarding scheduled hours, the remark by Beaty's supervisor ("If you're on time, you're late. If you're early, you're on time."), and Lietzow's expert analysis of five employees' time

20

cards and Agent States Reports. The trial court then summarized defendant's evidence, including its policies requiring accurate recording of time worked and testimonial evidence that CSRs, including Cruz, "understood that they must record all working time" and further understood that logging into and out of their computers was work time.

The trial court concluded that individual questions predominated as to this subclass, because there was "no substantial evidence demonstrating that Defendant had a uniform policy requiring CSRs to work off-the-clock before and/or after their scheduled shifts. To show Defendant's off-the-clock liability, the trier of fact would have to conduct a CSR-by-CSR inquiry to determine facts such as whether he/she performed off-the-clock work, why he/she did not record the time given Defendant's policy requiring accurate recording of time, and whether Defendant had actual or constructive knowledge that he/she worked off-the-clock." In a footnote, the court observed that Beaty's testimony about his supervisor's remark "suggests that supervisors communicate different instructions to their respective supervisees."

The court further stated that defendant argued that the Agent States Reports were unreliable because Softphone was not a timekeeping system and CSRs were not always precise when using it. In the subsequent portion of its ruling addressing the Second Meal Period Subclass, the court explicitly agreed the Agent States Reports were unreliable.

B.    *On-Premises Rest Period Subclass*

The trial court described plaintiffs' theory of liability for the On-Premises Rest Period Subclass as, "Plaintiffs contend that Defendant exerted control over how employees spend their rest

21

break time." It summarized their evidence, namely the orientation document stating "It is not permissible to leave the bank premises during breaks," and PMK testimony that "I didn't know of anybody who left the call center" and "I never observed anybody leaving" during rest periods."

The court concluded that plaintiffs failed to provide substantial evidence of a uniform policy prohibiting CSRs from leaving call center premises during their rest periods. It explained, "First, Plaintiffs have not presented evidence that the orientation document containing that prohibition was distributed or applied to all CSRs. Second, while it is true that [PMK] Ortega testified that '[she] didn't know of anybody who left the call center' and '[she] never observed anybody leaving,' she did not testify that Defendant had a policy against leaving the premises. In fact, when asked if she 'kn[e]w one way or another whether there was a rule as to whether you could or could not leave during rest breaks,' Ortega responded, 'No.' . . . . Third, while Plaintiffs present declarations from CSRs stating that they were not allowed to leave the premises, Defendant presents declarations from CSRs stating the opposite, requiring a CSR-by-CSR inquiry as to what rest break policy was communicated to him/her and whether he/she did or did not leave the premises during his/her rest breaks." For these reasons, the court found that individual questions predominated.

C.    *Third Rest Period Subclass*

With respect to this subclass, the court stated "Plaintiffs contend that none of Defendant's written materials (i.e., Human Resources Manual, employee policy guide, and employee handbook) contain a provision for a third rest period. It is Plaintiffs' position that the absence of a policy 'fails to give full

22

effect to the "major fraction" language'" of Wage Order No. 4. The court further stated that plaintiffs argued the unlawful policy was subject to common proof, namely the Agent States Reports and expert Drogin's analysis thereof finding that 243 of 325 shifts over 10 hours lacked a third rest period entry. The court then summarized defendant's argument that its policy was not facially defective, and its evidence to that effect, declarations from CSRs and supervisors and the wage and hour training materials.

The court concluded the "alleged unlawful policy of [not] providing a third rest period to CSRs who work a shift of over ten hours is not susceptible to common proof." It explained: "even assuming, *arguendo*, that its rest period policy was facially defective, Defendant correctly contends that there is no substantial evidence of a universal practice of denying third rest periods. Indeed, Defendant presents evidence (contrary to Plaintiffs' evidence) that it provided CSRs who worked a shift of over 10 hours a third rest period of 15 minutes in duration. … Further, an individualized inquiry is necessary to determine issues such as why a CSR missed a third rest period for each particular occasion, whether he/she requested a rest period premium, why he/she chose not to do so."

D.     *Second Meal Period Subclass*

The trial court summarized plaintiffs' theory as to the Second Meal Period subclass as, "Defendant lacks a policy providing for a second meal period for CSRs who work shifts of over ten hours." It also summarized their evidence, including Drogin's analysis of the Agent States Reports showing that 99.7 percent of shifts longer than 10 hours did not reflect a second meal period.

The trial court rejected Drogin's analysis on the bases that the Agent States Reports were unreliable and that Drogin failed to account for the possibility that an employee had waived the second meal period.  "By contrast," the court noted, "Defendant's expert, who took into account the second meal period waivers found at the bottom of employee timesheets, found only 11 meal period violations out of 20,043 analyzed shifts."  The court further determined that individualized inquiry would be necessary to determine why a CSR missed a second meal period, because defendant provided evidence that such breaks were offered, and case law dictates that employers are not obligated to police meal breaks to ensure that employees do not perform work during them.  "For these reasons," the court concluded, "individual questions predominate as to the Second Meal Period Subclass."

E.    *Other Class Certification Requirements*

In addition to ruling that individual issues predominated each of plaintiffs' proposed subclasses,[6] the trial court addressed the remaining class certification requirements.  With respect to typicality, the court agreed with defendant that plaintiffs Beaty and Cruz were not typical of the Third Rest Period and Second Meal Period subclasses because they did not work any shifts exceeding 10 hours.  The court was not persuaded by plaintiffs' single time card  showing Beaty had worked for either 10 or 12 hours, because "Beaty was responsible for ensuring accurate recording of his time" and "[t]here are a multitude of conceivable reasons for the 10-hour total" Beaty approved versus the 12 hours he recorded.  It also rejected plaintiffs' assertion that Beaty

---

[6]This includes the Derivative Claims subclass, which the trial court found "not amenable to class certification" for "the same reasons as the underlying claims."

24

worked over 10 hours in any event because he had to log in to his computer early, finding that "merely assumes that on that particular date (11/29/12) Plaintiff Beaty did work-off-the-clock." The trial court further agreed with defendant that plaintiffs were not adequate class representatives due to "the fact that some CSRs were responsible for enforcing Defendant's alleged illegal meal and rest period policies and practices."

The trial court considered manageability and rejected plaintiffs' trial plan as inadequate in five respects. First, the court found that plaintiffs placed too much emphasis on "how the issues could potentially be winnowed prior to trial . . . as opposed to how Plaintiffs intend to manage the issues at trial." Second, it concluded that the plan failed to demonstrate how individualized issues, including defendant's affirmative defenses, would be managed. Third, "to the extent Plaintiffs seek to rely upon the Agent States Reports, Defendant has demonstrated the unreliability of such reports," which the court further found "do not answer the individualized issues raised by Plaintiffs' claims." Fourth, the court found that the trial plan failed to show how defendant's due process rights would be protected. "Plaintiffs' failure to deal with the highly individualized nature of the defenses in this case as part of a trial plan is fatal to its [*sic*] claim of manageability." Finally, the court concluded that plaintiffs' expert analyses were flawed in several respects, including "the small number of Agent States Reports analyzed," and a lack of understanding of the Softphone system and Agent States Reports.

The trial court summarized its ruling as follows: "for the reasons that Plaintiffs have not shown predominance of common questions, typicality as to the Second Meal Period Subclass and

25

the Third Rest Period Subclass, adequacy as to all the meal and rest period claims, and superiority/manageability, the motion for class certification is DENIED."

Plaintiffs timely appealed under the death knell doctrine. (See *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 757.)

**DISCUSSION**

I.    *Legal Principles*

A class action is a procedural device used to aggregate claims when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (Code Civ. Proc., § 382.) "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp.* (2012) 53 Cal.4th 1004,1021 (*Brinker*).) "'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."' [Citation.]" (*Ibid.*)  As the party seeking certification, plaintiffs bear the burden of demonstrating all three community of interest factors for each subclass.  (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104 (*Lockheed*).)

To establish predominance, plaintiffs must "place substantial evidence in the record that common issues predominate." (*Lockheed, supra*, 29 Cal.4th at p. 1108.)  "'[T]his means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her]

26

right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants.'" [Citation.]" (*Ibid.*) Whether common questions predominate "will often depend upon resolution of issues closely tied to the merits" of the claims, even though the certification of a class is a procedural question that generally does not turn on whether an action is legally or factually meritorious. (*Brinker*, *supra*, 53 Cal.4th at p. 1023.) At bottom, predominance is a factual question we review for substantial evidence. (*Id.* at p. 1022.)

The second community of interest requirement, typicality, refers to the nature of the class representative's claim, not the specific facts from which it arose or the specific relief sought. (*Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 375.) The purpose of the typicality requirement is to ensure that the class representative's interests align with those of the broader class. (*Ibid.*) The test of typicality is whether the action is based on conduct not unique to the named plaintiffs, whether the other class members experienced and have been injured by the same course of conduct as the named plaintiffs, and whether the other class members suffered the same or similar injury as the named plaintiffs. (*Ibid.*) The third requirement, adequacy, is similar. Named plaintiffs adequately represent a class where their interests are not in conflict with or antagonistic to those of the class members they seek to represent. (*Seastrom v. Neways* (2007) 149 Cal.App.4th 1496, 1502.)

"In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from

27

affirmative defenses, can be managed fairly and efficiently." (*Duran, supra*, 59 Cal.4th at p. 29.) "In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." (*Ibid.*; see also *Brinker*, *supra*, 53 Cal.4th at p. 1033.) Manageability is a key inquiry in determining whether a class action is a superior device for resolving a controversy; it is "just as important as the existence of common questions uniting the proposed class." (*Duran, supra*, 59 Cal.4th at p. 29.)

"In reviewing a class certification order, our inquiry is 'narrowly circumscribed.'" (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 967 (*Noel*).) "'"The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions."' [Citation.] 'Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal "'even though there may be substantial evidence to support the court's order.'"'" (*Noel*, at pp. 967-968, quoting *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436 (*Linder*).) Similarly, class action management decisions are also reviewed for abuse of discretion. (*Duran, supra*, 59 Cal.4th

28

at p. 49.) "We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record. . . .'" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) However, in conducting our review, we examine the trial court's "actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530.)

## II.     *Predominance Rulings*

### A.     *Minimum Wage and Overtime Subclass*

#### 1.     *Scope of Review*

In their opening brief, plaintiffs argue the trial court "erred in denying certification of the Minimum Wage and Overtime Subclass by rejecting all evidence that would enable Plaintiffs to litigate their claims on a class basis." They contend that they presented substantial evidence of a uniform policy requiring CSRs to work off-the-clock before and after their shifts; that "even if one gives credence to" the trial court's finding that the Agent States Reports are unreliable with respect to rest and meal periods, such reports "cannot lie about when call center employees log into the system at the beginning of the day or out of it at the end of the day"; that no individualized inquiry is necessary because time card data can be compared to the Agent States Reports; and that the discrepancies between the time cards and the Agent States Reports gave defendant at least constructive knowledge of the off-the-clock work. Plaintiffs develop these contentions over approximately four pages.

In their reply brief, plaintiffs devote approximately 32 pages—eight times as many—to different and significantly more detailed arguments regarding the Minimum Wage and Overtime

29

Subclass. They first contend that the "trial court ignored plaintiffs' theory of recovery and common evidence regarding computer login/boot up and logout/shut down time." Within this argument, they assert that the court failed to "meaningfully analyze" defendant's policies and improperly resolved the merits of plaintiffs' theory, and discuss at least six cases in which common questions were found to predominate on what they assert were similar facts. In their second argument, plaintiffs contend the trial court "made an impermissible merits determination when it decided defendants' off-the-clock policy was lawful," such that its decision rests on improper legal criteria and should be reversed. Third, plaintiffs contend that their "liability showing was not based on individual class member testimony" requiring individualized inquiry, clarify that they "sought to establish Defendants' liability through its [*sic*] generally applicable written corporate policies," and respond to points defendant raised in its response brief. Fourth, plaintiffs contend the trial court "erred in disregarding Agent State[s] Reports which showed CSRs were working off-the-clock," that this evidentiary error was prejudicial, and the Agent States Reports, even if "imperfect," offered a reasonable basis from which to calculate damages. Finally, plaintiffs argue that defendant's common policies and practices, "taken together," showed that defendant had actual or constructive knowledge that CSRs were not recording all time worked on their time sheets.

It is well established that the purpose of a reply brief is to address arguments made in the respondent's brief; it may not be used to raise new arguments or present new authorities. "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant.

[Citations.]" (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.) "'[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. [Citations.]' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26.) No such good reason was shown here. Thus, we address the arguments made in plaintiffs' reply brief only to the extent that they were adequately raised in the opening brief or made in response to arguments presented by defendant in its response brief. We take the same approach with respect to the other subclasses as well.

2. *Analysis*

Substantial evidence of a "systematic company policy to pressure or require employees to work off-the-clock" is required when plaintiffs seek to certify a class of individuals allegedly required to perform off-the-clock work. (*Brinker*, *supra*, 53 Cal.4th at p. 1051.) Employees who are clocked out are presumed to be doing no work, and it is the plaintiffs' burden to prove the contrary. (*Ibid.*) The trial court concluded there was "no substantial evidence demonstrating that Defendant had a uniform policy requiring CSRs to work off-the-clock before and/or after their scheduled shifts." This was not erroneous, particularly in light of plaintiffs' clarification that they "sought to establish Defendants' liability through its generally applicable written corporate policies."

The only written policy plaintiffs proffered in support of their minimum wage and overtime claim[7] did not by its terms

---

[7]As we noted above, the "Scheduling" orientation document to which plaintiffs refer in their briefing here was not presented

require or even allude to off-the-clock work.  It stated: "Good attendance and punctuality are expected of employees at Union Bank. You are responsible for adhering to your scheduled hours. Frequent or excessive absences or tardiness create a hardship for your branch or department and should be avoided. Nonexempt employees should arrive ready for work at their scheduled starting time, return from lunch and breaks promptly, and work until the work period ends."

To the extent the policy required employees to "arrive ready for work at their scheduled start time," the testimony of defendant's PMK proffered by plaintiffs stated that "work" included logging into and out of the computers, and plaintiff Cruz agreed in her deposition that "work" included "anything done at [her] workstation to prepare for [her] workday."  The trial court also was presented with declarations from several other CSRs and supervisors who had a similar understanding, as well as evidence that defendant had policies expressly requiring accurate recording of work time and prohibiting off-the-clock work. The trial court was entitled to weigh the parties' conflicting evidence and did not err in concluding there was no substantial evidence of a policy requiring CSRs to work off-the-clock and that individual inquiry would be required.  (See *Brinker*, *supra*, 53 Cal.4th at p. 1052; *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 991-992.)

Plaintiffs emphasize the policy's use of the phrase "scheduled hours," and directive to "work until the work period ends," which they contend "systematically required or, at minimum, pressured employees to strictly adhere to their

---

to the trial court in support of certifying this subclass.  We accordingly do not consider it here.

scheduled hours." The only evidence plaintiffs presented in support of this alleged systematic requirement or pressure was three declarations and an isolated comment from a single supervisor. The trial court reasonably concluded that this "anecdotal evidence of a handful of individual instances" (*Brinker*, *supra*, 53 Cal.4th at p. 1052) "suggests that different supervisors communicate different instructions to their respective supervisees" and that individualized inquiry would be required to establish defendant's liability on a class-wide basis.

Plaintiffs also note that the trial court supported its finding by ruling that the Agent States Reports were unreliable. They suggest this was incorrect—"Agent States Reports cannot lie about when call center employees log into the system at the beginning of the day or out of it at the end of the day"—and assert that the times on the reports are accurate. However, plaintiffs wait until their reply brief to formally challenge this discretionary evidentiary ruling and argue that it was prejudicial. We accordingly do not consider whether the ruling was an abuse of discretion.

Plaintiffs also argue that individualized inquiry is unnecessary because "whether employees logged into the Smartphone system before the times indicated on their timesheets may be shown by comparing the timesheet data to the Softphone login and logout data from the Agent States Reports." Such employee-by-employee, day-by-day comparisons epitomize the "CSR-by-CSR inquiry" the trial court concluded would be necessary on this record to demonstrate liability. To the extent plaintiffs' expert Lietzow performed this analysis for five employees, his results did not support plaintiffs' claim of a uniform policy. Instead, they showed that one of the five

33

employees accounted for 89 percent of the discrepancies between log in and clock in times, and another accounted for 86 percent of the discrepancies between log out and clock out times. The trial court did not abuse its discretion or, as plaintiffs suggest in their reply brief, improperly apply *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, by finding the Agent States Reports unreliable and Lietzow's analysis of them insufficient to demonstrate the predominance of common questions. "[C]lass treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment"' on common issues." (*Duran, supra*, 59 Cal.4th at p. 28.)

The final argument raised in plaintiffs' opening brief is that the discrepancies between the Agent States Reports and the time cards demonstrate defendant's actual or constructive knowledge that CSRs were working off-the-clock on its behalf. (See *Brinker*, *supra*, 53 Cal.4th at p. 1051; *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 584-585.) This is not a basis on which the trial court denied the motion, nor does it comport with plaintiffs' assertion that defendant's written policies form the basis of its theory of liability.

B.     *On-Premises Rest Period Subclass*

Plaintiffs contend that the trial court abused its discretion by ignoring their evidence of a uniform policy and failing to adequately consider their policy-based theory of liability. We agree.

"During required rest periods, employers must relieve their employees of all duties and relinquish any control over how employees spend their break time." (*Augustus v. ABM Security*

34

*Services, Inc.* (2016) 2 Cal.5th 257, 260, 269.) Plaintiffs contended defendant failed to do so by adopting a uniform policy—the orientation document—barring them from leaving the premises during rest breaks. They also presented testimony from defendant's PMK that the policy espoused in the orientation document was in effect during the class period, from Mena that she was not allowed to leave the premises during her rest periods, and from Beaty that he did not recall being authorized to leave during rest periods. The trial court found that individual issues would predominate because plaintiffs failed to present substantial evidence of a uniform policy or that the orientation document containing the alleged policy was distributed or applied to all CSRs. The court further observed that defendant's PMK also testified that she did not know whether defendant had a rule prohibiting CSRs from leaving the premises during rest periods, and defendant presented declarations from CSRs who stated they were allowed to leave.

"[W]hen analyzing the element of predominance for purposes of class certification, 'the focus must be on the policy the plaintiffs are challenging and whether the legality of that policy can be resolved on a classwide basis.'" (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 308, quoting *Lubin v. The Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 940 (*Lubin*). An employer does not have a "due process right to prove on an individualized basis that it provided off-duty rest periods to every class member." (*Lubin, supra*, 5 Cal.App.5th at p. 955.) "If [defendant] had a policy or practice that violates labor laws, then class treatment is appropriate. [Citation.] Individualized inquiries into whether an employee had a required break on a specific day is relevant to damages, and '[t]he fact that individual

35

[employees] may have different *damages* does not require denial of the class certification motion.' [Citation.]" (*Id.* at pp. 955-956.)

Plaintiffs' theory of liability—that defendant had a uniform policy prohibiting CSRs from leaving the premises during their breaks, and that policy allegedly violates the law—is by its nature a common question suited for class treatment. (*Naranjo v. Spectrum Security Services, Inc.* (2019) 40 Cal.App.5th 444, 481 (*Naranjo*), review granted on other grounds, Jan. 2, 2020, S258966; see also *Brinker*, *supra*, 53 Cal.4th at p. 1033.) The individualized issues the trial court emphasized—whether the policy was communicated to each CSR and whether each CSR in fact left the premises during rest breaks—relate to damages and do not require denial of class certification. (See *Naranjo*, *supra*, 40 Cal.App.5th at pp. 480-481.) "*Brinker*, *supra*, 53 Cal.4th 1004, [citation] does not require class proponents to establish the universal application of an allegedly illegal policy; rather, a class proponent need only show a 'consistent[ ]' application of the policy. [Citation.] In *Brinker*'s wake, courts have repeatedly found that a defendant employer's evidence of an inconsistent application of an illegal policy to be insufficient on its own to defeat class certification." (*Alberts v. Aurora Behavioral Health* (2015) 241 Cal.App.4th 388, 409 [collecting cases].) The court accordingly erred in finding that common questions did not predominate with respect to this subclass.

C.    *Third Rest Period Subclass*

In finding that this claim was "not susceptible to common proof," the trial court reasoned that even if defendant's policy were "facially defective," "there is no substantial evidence of a universal practice of denying third rest periods" and "individualized inquiry is necessary to determine issues such as

36

why a CSR missed a third rest period for each particular occasion, whether he/she requested a rest period premium, and if he/she did not request a rest period premium, why he/she chose not to do so." Plaintiffs contend this was error because liability could be determined based solely on the policy, and the only individualized inquiry necessary pertained to damages. Defendant contends plaintiffs' theory is "false," because it presented evidence that its policies were compliant, and the trial court was entitled to credit that evidence over plaintiffs'.

We agree with plaintiffs, largely for the same reasons discussed above in connection with the On-Premises Rest Period subclass. Plaintiffs alleged that defendant applied an illegal policy to all CSRs, which was articulated by the chart in the Human Resources Manual. Whether plaintiffs' evidence establishes liability is a common question well suited to class treatment. (*Naranjo*, *supra*, 40 Cal.App.5th at p. 481.) Certification of a class is a procedural question that generally does not turn on whether an action is legally or factually meritorious. (*Brinker*, *supra*, 53 Cal.4th at p. 1023.) Thus, defendant's contention that plaintiffs' theory is "false" is not an appropriate basis on which to deny certification.

The trial court's reasoning that plaintiffs were required to submit substantial evidence of a universal practice of denying third rest periods even if the policy were facially defective is legally erroneous. As noted above, "*Brinker*, *supra*, 53 Cal.4th 1004 [citation]does not require class proponents to establish the universal application of an allegedly illegal policy; rather, a class proponent need only show a 'consistent[ ]' application of the policy. [Citation.]" (*Alberts v. Aurora Behavioral Health*, *supra*, 241 Cal.App.4th at p. 409.)

Additionally, the possible areas of individualized inquiry that concerned the trial court pertain to damages suffered by individual CSRs and defenses possibly available to defendant. "[U]nder *Brinker*, the fact that individualized inquiry might be necessary to determine whether individual employees were able to take breaks despite the defendant's allegedly unlawful policy (or unlawful lack of a policy) is not a proper basis for denying certification. Rather, for purposes of certification, the proper inquiry is 'whether the theory of recovery advanced by the plaintiff is likely to prove amenable to class treatment.' [Citation.]" (*Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 726; see also *Lubin*, *supra*, 5 Cal.App.5th at pp. 941-942.) Plaintiffs' theory meets that standard. The trial court accordingly erred in finding that common questions did not predominate with respect to this subclass.

D.     *Second Meal Period Subclass*

The trial court found that individual questions predominated plaintiffs' second meal period claim for several reasons: the Agent States Reports on which plaintiffs relied to demonstrate a lack of second meal periods were unreliable, plaintiffs' expert did not consider meal period waivers, defendant's expert (who did consider the waivers) found exceedingly few missed meal periods, and individualized inquiry would be required to determine why a CSR did not take a second meal period. Echoing their previous arguments, plaintiffs contend their allegation of a defective or nonexistent policy is one that can be resolved on a classwide basis. They also argue that the trial court erred by "presum[ing] the validity of an affirmative defense with no proof" when it "criticized Plaintiff's [*sic*] expert for not accounting for alleged meal period waivers."

38

We agree that the trial court erred, as its decision rested on improper criteria. The Supreme Court "does not endorse . . . that the question why a meal period was missed renders meal period claims *categorically* uncertifiable." (*Brinker*, *supra*, 53 Cal.4th at p. 1052 (Werdegar, J., concurring).) "An employer's assertion that it did relieve the employee of duty, but the employee waived the opportunity to have a work-free break, is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief. Rather, . . . the assertion is an affirmative defense, and thus the burden is on the employer, as the party asserting waiver, to plead and prove it." (*Id.* at p. 1053 (Werdegar, J., concurring).) As we discuss more fully below, "whether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues." (*Id.* at p. 1054 (Werdegar, J., concurring).)

Plaintiffs' allegation of an unlawful policy (or lack thereof) was not dependent on the Agent States Reports the trial court deemed unreliable. While plaintiffs may ultimately be unable to prove that the policy in question had illegal effects on the class members, whether due to a lack of evidence or due to the validity of defendant's affirmative defense of waiver, that is not an issue to be resolved at the certification stage.

III.    *Typicality Ruling*

The trial court concluded that plaintiffs Beaty and Cruz were not typical of the Third Rest Period and Second Meal Period subclasses because there was no substantial evidence that either of them ever worked a shift of more than 10 hours. In doing so, it dismissed plaintiffs' reliance on a single time card that showed that Beaty worked a shift of either 10 or 12 hours; the time card is facially inconsistent in this regard.

39

Plaintiffs do not dispute the ruling as to Cruz, for whom they presented no evidence of shifts exceeding 10 hours. As to Beaty, however, plaintiffs contend the trial court "was wrong in its analysis of the factual record and whether it could find that typicality was lacking on that ground." They further assert, in reply, that "one timesheet evidencing a math mistake was not sufficient to undo [Beaty's deposition] testimony" that he "did not recall being authorized to take a second meal break or third rest break on shifts over ten hours." We are not persuaded the trial court abused its discretion.

To be typical of a class, a plaintiff should have the same or a similar injury as other members of the class. (*Seastrom v. Neways, Inc.*, *supra*, 149 Cal.App.4th at p. 1502.) Here, the alleged injuries were the denial of a third rest break and second meal period on shifts exceeding ten hours. The only evidence that Beaty worked even one shift in excess of ten hours during his five-to-six year tenure with defendant was a single, facially ambiguous timecard. The trial court was permitted to conclude that such evidence was not substantial evidence of typicality. To be substantial, evidence must be reasonable in nature, credible, and of solid value. (*Sav-On Drug Stores, Inc. v. Superior Court*, *supra*, 34 Cal.4th at p. 328.) The trial court reasonably questioned whether the timecard in question—on which Beaty affirmed he worked a total of 10 hours despite time entries indicating he worked 12—met that standard. Moreover, "'[w]here a certification order turns on inferences to be drawn from the facts, the reviewing court has no authority to substitute its discretion for that of the trial court.'" (*Ibid.*)

Plaintiffs point to a single case in their opening brief, *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 137-

138, disapproved on other grounds by *Noel, supra,* 7 Cal.5th at p. 986, fn. 15.  There, the trial court found plaintiffs were not typical of the class because they gave "incompatible and contradictory" deposition testimony regarding the time they spent on relevant projects.  (*Aguiar, supra,* 144 Cal.App.4th at p. 137.)  The appellate court concluded that the use of subclasses could solve the typicality problem:  "To the extent plaintiffs' testimony regarding the hours they worked on DWP contracts suggests they spent at least 20 hours per month on DWP goods, they can adequately represent a class of similarly situated employees.  Other putative class members can be represented adequately by a named plaintiff who did not work 20 hours per month on the DWP contracts. . . ."  (*Ibid.*)  Here, the groups plaintiffs seek to represent already have been divided into subclasses, and plaintiffs do not fit within the groups of CSRs affected by the policies the Third Rest Period and Second Meal Period subclasses are challenging.  "A class representative who does not have a claim against the defendants cannot satisfy the typicality requirement."  (*Martinez v. Joe's Crab Shack Holdings, Inc., supra,* 231 Cal.App.4th at p. 375.)

In their reply, plaintiffs point to Beaty's deposition testimony that he "did not recall being authorized to take a second meal break or third rest break on shifts over ten hours."  They suggest that this testimony shows he was subject to the same policy as other CSRs, and cannot be "undone" by the ambiguous timecard.  Their reliance on *Franchise Tax Board Limited Liability Corp. Tax Refund Cases* (2018) 25 Cal.App.5th 369, 395-396 does not support their position.  In that case, the difference between the plaintiffs and the class they sought to represent was "essentially irrelevant": though plaintiffs earned

41

income from both in and out of state, the question at issue was whether a levy to which all potential class members were subject was unconstitutional.  Here, the difference between plaintiffs and the Third Rest Period and Second Meal Period subclasses is not "irrelevant" to their right to recover; it is determinative.

IV.    *Adequacy Ruling*

The trial court concluded that plaintiffs were not adequate representatives of any of the rest period and meal period claims because "some CSRs were responsible for enforcing Defendant's alleged illegal meal and rest period policies and practices."  Citing *Lampe v. Queen of the Valley Medical Center* (2018) 19 Cal.App.5th 832, 850 (*Lampe*), plaintiffs contend the "fundamental error here was that there was no evidence that *Plaintiffs* ever served as leads themselves, nor any other evidence that *their* interests were 'antagonistic to or in conflict with the objectives of the classes.'"  We agree that the trial court's ruling was unsupported by substantial evidence.

"'The adequacy of representation component of the community of interest requirement for class certification comes into play when the party opposing certification brings forth evidence indicating widespread antagonism to the class suit.' [Citation.]"  (*Martinez v. Joe's Crab Shack Holdings*, *supra*, 231 Cal.App.4th at p. 375.)  Here, defendant presented a few declarations stating that defendant "sometimes" relied on "lead CSRs" to enforce and administer its meal and rest break policies, that such lead CSRs had discretion, and that "some proposed class members" served as "lead CSRs."  This evidence did not evince "widespread antagonism" to the class.  There is no indication how many potential class members served as lead CSRs, nor is there any indication that plaintiffs were among them.  (Contra *Lampe*, *supra*, 19 Cal.App.5th at p. 850 [named

plaintiff "testified she was responsible for scheduling meal breaks for nurses in her unit which caused a conflict of interest with the members of the class"].)  To the extent that some of the 180 putative class members may have served as lead CSRs, any conflict may be remedied by creating a subclass of lead CSRs or by excluding lead CSRs from the subclasses already defined by plaintiffs.  (*Martinez v. Joe's Crab Shack Holdings*, *supra*, 231 Cal.App.4th at pp. 376-377.)

Defendant asserts that "*Lampe* does not stand for the proposition that proposed class representatives must be responsible for providing meal and rest periods in order for class conflicts to exist.  Instead, conflicts arise if some proposed class members have conflicts with the class representatives or others."  Defendant provides no support for this contention, which we do not find persuasive.  The only discussion of adequacy in *Lampe* concerns a named plaintiff who was responsible for scheduling meal breaks for members of the class she sought to represent.  (See *Lampe*, *supra*, 19 Cal.App.5th at p. 850.)  Thus, the only proposition *Lampe* stands for is that a named plaintiff with similar responsibilities may be antagonistic to a class containing her supervisees.  There is no evidence that is the case here.

V.      *Manageability/Superiority Ruling*

When considering a class certification motion, the trial court "must pay careful attention to manageability," or whether adjudication of the claims can be managed fairly and efficiently.  (*Duran*, *supra*, 59 Cal.4th at p. 29.)  Even if a plaintiff has satisfied all of the other class certification criteria, "class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class

43

judgment" on common issues.'" (*Id.* at p. 28.) "In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." (*Id.* at p. 29.) The manageability assessment informs the trial court's determination of whether a class action is a superior means of resolving the claims. "In determining the superiority of class treatment, the trial court must weigh the respective benefits and burdens of class litigation; maintenance of the class action will only be permitted where substantial benefits accrue to both the litigants and the court." (*Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 156.)

The trial court concluded that the superiority and manageability requirements were not satisfied because plaintiffs failed to carry their burden of demonstrating how individualized issues, including the adjudication of affirmative defenses, would be managed. Plaintiffs contend this conclusion was erroneous because it "ignores Plaintiffs' policy-based theories of liability" and focuses instead on "issues that are not even presented via Plaintiffs' theories, and in many instances are irrelevant to further class proceedings because the issues that concerned the court apply only" to subclasses not challenged in this appeal. They further assert that the individual issues the court identified relate to damages and therefore were not an appropriate basis on which to deny class certification.

The trial court did not abuse its discretion. Even plaintiffs who allege uniform policies "must still demonstrate that the illegal effects of this conduct can be proven efficiently and

44

manageably within a class setting" (*Duran*, *supra*, 59 Cal.4th at p. 29), and plaintiffs failed to do that here. Their trial plan largely reiterated their predominance arguments, providing little information or assurance to the trial court that individualized inquiries could be managed. Although defendant may not have "a due process right to litigate an affirmative defense as to each individual class member," it "must have an opportunity to present proof of [its] affirmative defenses within whatever method the court and the parties fashion to try these issues." (*Id.* at p. 38.) Plaintiffs did not propose any method, or even acknowledge the possibility that affirmative defenses may be presented.

Plaintiffs correctly observe that "[d]efenses that raise individual questions about the calculation of *damages* generally do not defeat certification." (*Duran*, *supra*, 59 Cal.4th at p. 30.) Yet "whether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues." (*Brinker*, *supra*, 53 Cal.4th at p. 1054 (Werdegar, J., concurring).) The Supreme Court has "encouraged the use of a variety of methods" to ensure the manageability of "individual claims that might otherwise go unpursued to be vindicated, and to avoid windfalls to defendants that harm many in small amounts rather than a few in large amounts." (*Ibid.*) "Representative testimony, surveys, and statistical analysis all are available as tools to render manageable determinations of the extent of liability." (*Ibid.*) As the trial court found, plaintiffs' "failure to deal with the highly individualized nature of the defenses in this case as part of a trial plan is fatal to its [*sic*] claim of manageability." Even with respect to subclasses in which defendant's intended affirmative

45

defenses were apparent, such as the waiver defense to the Second Meal Period subclass, plaintiffs offered no suggestions as to methods that might be used to manage those defenses at trial. Plaintiffs now assert that "the legality and enforceability of Defendants' meal period waivers is itself subject to classwide proof through business records," employee timecards and signed waivers, but they did not raise this point before the trial court.[8]

The trial court also expressed concern about plaintiffs' plan to use their experts' analyses to prove damages at trial, as the Agent States Reports were unreliable and "Plaintiffs did not ask them [the experts] to formulate any aspect of a trial plan by which this case could be tried." Plaintiffs have not challenged this aspect of the trial court's ruling on appeal. Even if they had, we are not persuaded that this consideration was beyond the trial court's purview in assessing manageability and superiority. The trial court did not abuse its discretion in concluding that plaintiffs failed to demonstrate superiority and manageability.

## DISPOSITION

The order of the trial court is affirmed. The parties are to bear their own costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


MANELLA, P. J.                                    CURREY, J.

---

[8]Even if they had, it is unclear how the question of whether each CSR signed a valid waiver would be susceptible to common proof, or why "[t]here is no need to parade each class member to the witness stand."

46